UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                 **DECISION AND ORDER**
                                                                      05-CR-232S

MOHAMED BAHAA EL DIN HAMDY,

                Defendant.

## I. INTRODUCTION

Defendant Mohamed Bahaa El Din Hamdy is charged in a four-count Second Superseding Indictment with Concealing a Material Fact (18 U.S.C. § 1001 (a)(1)), Making a Materially False Statement and Representation (18 U.S.C. § 1001 (a)(2)), Making and Using a Materially False Document (18 U.S.C. § 1001 (a)(3)), and Making a False Statement on an Immigration Application (18 U.S.C. § 1546 (a)).

Trial on this indictment commenced on June 14, 2006. After four days of trial and six government witnesses, Defendant moved for a mistrial when a government witness testified about investigations into uncharged criminal conduct involving Defendant. After hearing from counsel in compliance with Federal Rule of Criminal Procedure 26.3,[1] this Court granted Defendant's motion and advised that this decision would follow. It is for the reasons stated below that this Court granted Defendant's request for a mistrial.

---

[1] The rule provides as follows: "Before ordering a mistrial, the court must give each defendant and the government an opportunity to comment on the propriety of the order, to state whether that party consents or objects, and to suggest alternatives." FED. R. CRIM. P. 26.3

1

## II. FACTS

According to the allegations in the Second Superceding Indictment, Defendant is a citizen of Egypt who entered the United States lawfully in September of 2000, based on his marriage to a United States citizen. In December of 2001, Defendant and his wife divorced. In April of 2002, Defendant entered the United States Army in Buffalo, New York.

On December 26, 2002, the Immigration and Naturalization Service[2] received Defendant's Application for Naturalization ("the Application"), which was dated October 30, 2002. Defendant sought naturalization based on his qualifying military service.

On or about April 1, 2003, Defendant left his military unit without authority and traveled to Egypt. He returned to the United States via the Denver International Airport approximately two months later, on May 28, 2003. An agent from the Federal Bureau of Investigation ("FBI") met Defendant at the airport, interviewed him, and then released him.

Thereafter, on August 3, 2003, the Army charged Defendant under Article 86 of the Uniform Code of Military Justice with being absent from his unit without authority between April 1, 2003, and May 29, 2003. This charge was resolved on August 21, 2003, when the Army discharged Defendant under other than honorable conditions in lieu of trial by court-martial.

---

[2] On March 1, 2003, the Immigration and Naturalization Service ("INS") was reconstituted as the Bureau of Immigration and Customs Enforcement and the Bureau of Citizenship and Immigration Services ("USCIS"), both falling under the umbrella of the Department of Homeland Security ("DHS"). See Kanacevic v. INS, 448 F.3d 129, 129 n.1 (2d Cir. 2006).

On April 13, 2005, Defendant sat for an interview with a District Adjudication Officer from USCIS in Buffalo, New York, regarding his Application. The officer verified and ensured the accuracy of the information Defendant provided on the Application. Under the "Good Moral Character" section of the Application, Defendant answered "No" to the question of whether he was ever charged with committing any crime or offense. At the end of the interview, Defendant signed the Application, swearing and certifying "under penalty of perjury under the laws of the United States of America" that the contents of the Application subscribed by him were true and correct to the best of his knowledge and belief. Approximately three months later, on July 15, 2005, the government commenced this false statement prosecution by filing a criminal complaint.

### III. DISCUSSION AND ANALYSIS

**A.   Standard for Granting a Mistrial**

"A motion for mistrial is addressed to the sound discretion of the trial judge." United States v. Rudaj, No. 04 Cr. 1110, 2005 WL 2746564, at *3 (S.D.N.Y. Oct. 25, 2005) (quoting United States v. Marshall, 458 F.2d 446, 451 (2d Cir. 1972)). A mistrial may be granted when a defendant suffers actual prejudice from the introduction of improper testimony or evidence. See United States v. Colombo, 909 F.2d 711, 713-14 (2d Cir. 1990).

In some cases, curative instructions to the jury may ameliorate prejudice to the defendant. In this regard, the law presumes "that a jury will follow an instruction to disregard inadmissible evidence inadvertently presented to it." Greer v. Miller, 483 U.S. 756, 766 n. 8, 107 S. Ct. 3102, 97 L. Ed. 2d 618 (1987). However, a curative instruction

will not suffice where a defendant shows "[1] that it is 'overwhelming[ly] probab[le]' that the jury will be unable to follow the instruction; and [2] that the effect of the evidence would have a strong likelihood of being 'devastating' to the defendant." Id. (internal citations omitted); Dickens v. Herbert, No. 00 Civ. 3249, 2002 WL 1728514, at *5 (S.D.N.Y. July 25, 2002) (quoting same); see also Black v. Walker, No. 96 Civ. 0668E, 2000 WL 461106, at *8 (W.D.N.Y. April 14, 2000) (the assumption that juries will follow limiting and curative instructions "does not apply when the prejudice is so severe that the instructions would be ineffective").

For example, in United States v. Colombo, 909 F.2d 711, 712 (2d Cir. 1990), the appellant, William F.X. Klan, appealed his convictions for conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 (d) (1988), and conspiracy to distribute narcotics, 21 U.S.C. § 846 (1988). During the trial, the prosecutor introduced and dwelled on the fact that Klan's co-defendants raped and sodomized a woman during the course of a robbery that formed one of the predicate acts of the RICO conspiracy. Id. at 712-14. The prosecutor questioned several witnesses about this incident, including Klan, who was challenged "a number of times" about his knowledge of the rape and sodomy, which he denied knowing about. Id. at 714.

On appeal, the Second Circuit held that the district court's admonishment to the jury to consider the evidence of the uncharged rape and sodomy only as background information was insufficient. Id. at 715. The court reasoned that "[w]ith such a negative vision of the defendant, there is an 'overwhelming probability' that the jury was unable to consider dispassionately the evidence of such a violent crime simply as background for the surrounding events. By its very shocking nature, it becomes the centerpiece of the trial."

Id.[3]  In this Court's view, similar circumstances were present in this case.

## B.    Trial Testimony

### 1.    Agent Nishida

At trial, the Government offered testimony from FBI Agent Joel E. Nishida.  Agent Nishida explained to the jury that he is an eighteen-year veteran special agent with the FBI, assigned to the Joint Terrorism Task Force at the Denver International Airport.  (TR. 6, lines 15-25; TR. 7, lines 1-2; TR. 29, lines 11-15.[4])  He testified that on May 28, 2003, he was called to the Denver airport to interview Defendant "to see if there were any national security issues to deal with."  (TR. 7, lines 3-7; TR. 8, lines 2-12, 22-25.)

Agent Nishida testified that he interviewed Defendant for one hour and forty minutes.  (TR. 7, lines 8-9.)  He specifically testified that he advised Defendant at the time of the interview that he was not interviewing him about his military problems, but rather, was there to discuss "other issues."  (TR. 9, lines 15-22.)  At the conclusion of the interview, Defendant was released.  (TR. 24, lines 10-12.)

---

[3] Certainly there are cases aplenty, most of which arise in the habeas context, in which curative instructions have been found to sufficiently eradicate any unfair prejudice to the defendant.  See, e.g., Dickens v. Herbert, No. 00 Civ. 3249, 2002 WL 1728514, at *4-5 (S.D.N.Y. July 25, 2002) (witness provided spontaneous single statement regarding uncharged crime); Roldan v. Artuz, 78 F. Supp.2d 260, 280-82 (S.D.N.Y. 2000) (testimony included inadmissible evidence of uncharged crimes, but was relevant to establishing the defendant's identity); Arroyo v. Walker, 964 F. Supp. 65, 69 (E.D.N.Y. 1997) (admission of testimony that alluded to another crime was harmless given the inadvertent and vague nature of the reference and that the prosecutor did not emphasize or develop the statement).  These cases, however, present less egregious circumstances than were present in this case.

[4] Referring to the transcript from proceedings on June 19, 2006.

On cross-examination, defense counsel twice inquired as to whether Agent Nishida ever charged Defendant with any sort of terrorist activity. (TR. 19, line 25; TR. 20, line 1;TR. 22, lines 21-23.) Both times Agent Nishida responded that no such charges were brought. (TR. 20, line 2; TR. 22, line 23.) Agent Nishida further testified that no charges of any nature were brought against Defendant. (TR. 23, lines 15-16.) Agent Nishida concluded his testimony on re-direct by explaining to the jury that he did not verify any of the information that Defendant provided regarding his military issues because it was not his responsibility to handle that matter. (TR. 30, lines 3-7.) Instead, Agent Nishida stated that his reports "had to do with just information, intelligence." (TR. 30, lines 7-9.)

### B.    Captain Canedy

Immediately following Agent Nishida's testimony, Captain John Michael Canedy testified for the Government. Captain Canedy identified himself as an attorney for the United States Army Judge Advocate General Corp. ("JAG"). (TR. 33, lines 21-23; TR. 34, lines 2-10.) He explained that in April of 2003, he was assigned to Fort Carson, Colorado, as a military prosecutor responsible for criminal justice matters at Fort Carson. (TR. 35, lines 1-10; TR. 37, lines 5-8.) He further indicated that he was responsible for prosecuting Defendant for leaving his unit without permission. (TR. 37, lines 18-25; TR. 56, line 16-19.)

Captain Canedy testified that he was aware that Defendant's attorney had arranged for Defendant to turn himself in to military officials the day after his return from Egypt. (TR 42, lines 14-19.) He further testified that Defendant had two attorneys, one of whom contacted him relative to the military prosecution. (TR. 56, lines 20-25; TR. 57, lines 1-12.) Captain Canedy further testified that he was contacted by Defendant's attorneys from time to time after Defendant returned from Egypt. (TR. 57, lines 9-12.)

Captain Canedy testified that Defendant's civilian attorney, Skip Morgan, contacted him on June 11, 2003.  (TR. 57, lines 13-15; TR. 58, lines 12-19.)  He stated that Mr. Morgan contacted him "to giv[e him] the background on Mr. Hamdy's situation." (TR. 58, lines 24-25; TR. 59, line 1.)

Military charges were not filed against Defendant until August of 2003.  (TR. 62, lines 11-17.)  Captain Canedy testified that military charges are laid "as quickly as possible" against soldiers believed to have committed an offense.  (TR. 63, lines 9-13.)  He then confirmed that there was a period of delay between Defendant's return from Egypt and the filing of charges against him.  (TR. 63, lines 14-21).  The following exchange then occurred:

> BY MS. KRESSE[5]:
>
> Q.   Is there a reason for that delay, sir?
>
> [Objection overruled]
>
> THE WITNESS:   Yes.
>
> MS. KRESSE:   What was the reason for the delay?
>
> THE WITNESS:   The reason for the delay, I had information that was provided from his defense counsel –
>
> [Objection sustained]
>
> BY MS. KRESSE:
> Q.   One second, Judge, please.  Sir, during this period of time were you conducting an investigation of this matter?
>
> A.   Yes.

---

[5] Ms. Kresse is one of the federal prosecutors assigned to this case.

7

| | |
|---|---|
| Q. | And during this period of time were you having discussions with attorneys for Mr. Hamdy? |
| A. | Yes. |
| Q. | Did you have any understanding about the possibility of charges being laid? |
| | [Objection sustained; Prosecutor directed to repeat question] |

BY MS. KRESSE:

| | |
|---|---|
| Q. | During this period of time, did you have information that the defendant might be subject to other charges by another agency? |
| A. | Yes. |
| Q. | And was that part of the reason for your delay in charging him? |
| A. | Yes. |

(TR. 63, lines 22-25; TR. 64, lines 1-25; TR. 65, lines 1-13.)

After this exchange, defense counsel requested a sidebar, and then moved for a mistrial.

## C.  Prejudice to Defendant and Inadequacy of a Curative Instruction

This Court granted Defendant's request for a mistrial after hearing the arguments of counsel. In this Court's view, the combination of Agent Nishida's and Captain Canedy's testimony left the jury with the unmistakable and uncorrectable impression that Defendant may have been under investigation for terrorist-related activity between the time he returned from Egypt and the time military charges were filed against him. This impression could not be overcome by a curative instruction.

The jury first heard Agent Nishida testify that he was called to the Denver Airport in his role as a Special Agent assigned to the Joint Terrorism Task Force.[6] He explained to the jury that he interviewed Defendant for one hour and forty minutes "to see if there were any national security issue to deal with." He specifically testified that he was *not* interested in nor responsible for anything having to do with Defendant's military issues. The inference is therefore that he was tasked with determining whether Defendant presented a terrorist threat or could provide information related to terrorism. This is confirmed by Agent Nishida's testimony that the reports of his interview "had to do with just information, intelligence."

Given Defendant's Egyptian nationality, the fact that he is a Muslim, and Agent Nishida's testimony concerning the national security-related purpose of his contact with Defendant, there was a very real danger that the jury would improperly conclude that law enforcement viewed Defendant as involved in terrorist activities. This inference was implicit in Agent Nishida's testimony. Even though there was testimony that Defendant was never charged with terrorist activity, it was clear from Agent Nishida's testimony that Defendant's return from Egypt caused some national security concerns, at least enough to call out the Joint Terrorism Task Force.

Agent Nishida's testimony, standing on its own, was not unfairly prejudicial. It was not until Captain Canedy testified that Defendant was in fact being investigated by another agency that actual prejudice occurred. Captain Canedy testified that he was in contact with Defendant's attorney who wanted to "giv[e him] background on Mr. Hamdy's situation."

---

[6]Nothing herein should be construed to suggest that the Government acted purposefully or improperly in creating the circumstances that required the mistrial.

The reference to "situation" could be interpreted either as a reference to Defendant's military situation, or, in light of Agent Nishida's testimony, a reference to other investigations. Captain Canedy then testified that the reason he delayed bringing military charges against Defendant was because he knew that another agency may also be bringing charges against Defendant. This again raised the specter that Defendant was actively being investigated after his return from Egypt. Based on the evidence before the jury, the only reasonable inference was that Agent Nishida's Joint Terrorism Task Force was the "other agency" contemplating charges.

The disconnect between the false statement charges in the Second Superseding Indictment and the rather overt suggestion at trial that Defendant was being actively investigated for terrorism-related activity was simply too great to overcome. See Columbo, 909 F.2d 711, 715 (linking defendant charged in robbery offense to suggestion that he was connected to an act of rape and sodomy created "overwhelming probability" that jury could not consider evidence dispassionately). This Court thoroughly considered the possibility of giving a curative instruction to the jury. In the end, this Court concluded that it was impossible to craft a curative instruction in such a way that would not reemphasize or highlight the prejudicial testimony. To avoid the return of a verdict tainted by the influence of unfairly prejudicial testimony, this Court declared a mistrial.

## IV. CONCLUSION

For the foregoing reasons, this Court granted Defendant's Motion for Mistrial. The Government has since moved for a new trial date. Counsel for the parties shall appear as directed below.

## V. ORDER

IT HEREBY IS ORDERED, that counsel shall appear before this Court on Friday, July 7, 2006 at 9:00 a.m. for a status conference to discuss the Government's Motion for a New Trial Date (Docket No. 115).

SO ORDERED.

Dated:　　　June 28, 2006
　　　　　　　Buffalo, New York

　　　　　　　　　　　　　　　　　　　　　　　/s/William M. Skretny
　　　　　　　　　　　　　　　　　　　　　　　WILLIAM M. SKRETNY
　　　　　　　　　　　　　　　　　　　　　United States District Judge